UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

KIM E. PREVITE, as Administrator of the
ESTATE OF ANTHONY J. PREVITE,

       Plaintiff,

v.

TOWN OF KENSINGTON, NH,
CITY OF PORTSMOUTH, NH,
TOWN OF HAMPTON, NH,
TOWN OF GREENLAND, NH,
TOWN OF EXETER, NH,
TOWN OF SEABROOK, NH,
TOWN OF DURHAM, NH, CHIEF SCOTT
CAIN, OFFICER JAMES COLLIER,
DETECTIVE MICHAEL MUNCK,
DEPUTY CHIEF JOSH MCCAIN,
LIEUTENANT SETH TONDREAULT,
DETECTIVE BARRY BUCZEK, CHIEF
ALEXANDER J. RENO, CAPTAIN
NICHOLAS SMALL, SERGEANT
CHRISTOPHER KEYSER, SERGEANT
THOMAS SICHKO, SERGEANT PETER
CONNOR, SERGEANT CRAIG FORREST,
OFFICER NICHOLAS GLOWACKI,
SERGEANT THEODORE SIERAD,
SERGEANT ROBERT KENYON, and
CORPORAL JAY PAPPALARDO,

       Defendants.

Civil Action No. 1:25-cv-00511

## COMPLAINT & DEMAND FOR JURY TRIAL

    Kim E. Previte ("Kim" or "Plaintiff"), as administrator of the Estate (the "Estate") of

Anthony J. Previte ("Anthony"), files this Verified Complaint against the municipalities (through

their respective police departments), specialized units, and officers that led, coordinated, and

participated in the pattern of gross escalation and overreaction that occurred at the Previte

residence on July 22, 2024 and led to Anthony being shot dead by the police. Anthony, who was in the midst of a mental health crisis on that date, was in his own home alone. He was not attempting to harm anyone. The responding police officers and departments knew all of these facts. But rather than addressing the situation in a manner designed to lead to peaceful resolution, the police departments, units, and officers involved quickly engaged in a series of escalatory actions, using military-style tactics and equipment, threatening the paranoid, solitary subject, firing at least one gunshot into the home and striking him, and then eventually shooting him 15-20 times as he ran *away* from officers outside the house. These acts – both handling the confrontation in an unreasonable manner leading to dangerous escalation and eventually shooting Anthony dead – constitute violations of Anthony's constitutional rights, wrongful death, and negligence, entitling Plaintiff to damages to be determined at trial.

## Parties

1.      Kim is the administrator of the Estate, and she brings this action on behalf of the Estate. At all times relevant to this action, Anthony and Kim resided at 6 Olivia Lane, Kensington, NH 03833 (the "Previte Residence").

2.      Defendant, the Town of Kensington, New Hampshire, ("Kensington") is a town in New Hampshire that operates the Kensington Police Department ("Kensington PD"). Upon information and belief, Kensington is responsible for establishing policies and procedures for law enforcement officers employed by the Town of Kensington, and is located at 95 Amesbury Road, Kensington, NH 03833.

3.      Defendant, the City of Portsmouth, New Hampshire, ("Portsmouth") is a city in New Hampshire that operates the Portsmouth Police Department ("Portsmouth PD") and is part of the Seacoast Emergency Response Team ("SERT"), a collective body of local police

departments that organize in emergency situations. Upon information and belief, Portsmouth is responsible for establishing policies and procedures for law enforcement officers employed by the City of Portsmouth, and is located at 1 Junkins Ave, Portsmouth, NH 03801.

4.    Defendant, the Town of Hampton, New Hampshire ("Hampton") is a town in New Hampshire that operates the Hampton Police Department ("Hampton PD") and is part of SERT. Upon information and belief, Hampton is responsible for establishing policies and procedures for law enforcement officers employed by the Town of Hampton, and is located at 100 Winnacunnet Road, Hampton, NH 03842.

5.    Defendant, the Town of Greenland, New Hampshire, ("Greenland") is a town in New Hampshire that operates the Greenland Police Department ("Greenland PD") and is part of SERT. Upon information and belief, Greenland is responsible for establishing policies and procedures for law enforcement officers employed by the Town of Greenland, and is located at 575 Portsmouth Ave, Greenland, NH 03840.

6.    Defendant, the Town of Exeter, New Hampshire, ("Exeter") is a town in New Hampshire that operates the Exeter Police Department ("Exeter PD") and is part of SERT. Upon information and belief, Exeter is responsible for establishing policies and procedures for law enforcement officers employed by the Town of Exeter, and is located at 10 Front Street, Exeter, NH 03833.

7.    Defendant, the Town of Seabrook, New Hampshire, ("Seabrook") is a town in New Hampshire that operates the Seabrook Police Department ("Seabrook PD") and is part of SERT. Upon information and belief, Seabrook is responsible for establishing policies and procedures for law enforcement officers employed by the Town of Seabrook, and is located at 99 Lafayette Road, Seabrook, NH 03874.

8.      Defendant, the Town of Durham, New Hampshire, ("Durham") is a town in New Hampshire that operates the Durham Police Department ("Durham PD"). Upon information and belief, Durham is responsible for establishing policies and procedures for law enforcement officers employed by the Town of Durham, and is located at 8 Newmarket Road, Durham, NH 03824.

9.      Defendant, Chief Scott Cain ("Chief Cain"), is and was at all relevant times the Chief of the Kensington Police Department, and is and was at all relevant times to this action responsible for the decisions and actions of all law enforcement officers employed by the Town of Kensington.

10.     Defendant, Officer James Collier ("Officer Collier") is and was at all relevant times a law enforcement officer employed by the Town of Kensington and was the officer that initially responded to the Previte Residence on July 22, 2024.

11.     Defendant, Detective Michael Munck ("Detective Munck") is and was at all relevant times a law enforcement officer employed by the Town of Kensington and was involved with the initial response to the Previte Residence on July 22, 2024.

12.     Defendant, Deputy Chief Josh McCain ("Deputy Chief McCain"), is and was at all relevant times the Deputy Chief of the Exeter Police Department, and is Tactical Commander (C-1) of SERT. Upon information and belief, Deputy Chief McCain was in charge of the SERT response and activation to the Previte Residence on July 22, 2024.

13.     Defendant, Lieutenant Seth Tondreault ("Lieutenant Tondreault"), is and was at all relevant times to this action the Executive Tactical Officer (C-2) of SERT, as well as a law enforcement officer employed by the City of Portsmouth. Upon information and belief,

Lieutenant Tondreault was in charge of the SERT response and activation to the Previte Residence on July 22, 2024.

14.    Defendant, Detective Barry Buczek ("Detective Buczek"), is and was at all relevant times to this action the Executive Support Officer (C-3) of SERT, as well as a law enforcement officer employed by the Town of Hampton. Upon information and belief, Detective Buczek was one of the officers in charge of the SERT response and activation to the Previte Residence on July 22, 2024.

15.    Defendant, Chief Alexander J. Reno ("Chief Reno"), is and was at all relevant times to this action the Chief of the Hampton Police Department, as well as the Vice President of SERT. Upon information and belief, Chief Reno was one of the officers responsible for the decision to activate a SERT response at the Previte Residence on July 22, 2024.

16.    Defendant, Captain Nicholas Small ("Captain Small"), is and was at all relevant times a law enforcement officer employed by the City of Portsmouth, as well as a team leader on SERT. Upon information and belief, Captain Small was one of the officers in charge of SERT response and decisions at the Previte Residence on July 22, 2024.

17.    Defendant, Sergeant Christopher Keyser ("Sergeant Keyser"), is and was at all relevant times to this action a law enforcement officer employed by the Town of Hampton, as well as a team leader on SERT. Upon information and belief, Sergeant Keyser was one of the officers in charge of SERT response and decisions at the Previte Residence on July 22, 2024.

18.    Defendant, Sergeant Thomas Sichko ("Sergeant Sichko") is and was at all relevant times to this action a law enforcement officer employed by the City of Portsmouth, as well as the Drone Team Commander for the Portsmouth Police Department. Upon information

and belief, Sergeant Sichko was one of the officers in charge of the use of drones at the Previte Residence on July 22, 2024.

19.    Defendant, Sergeant Peter Connor ("Sergeant Connor") is and was at all relevant times to this action a law enforcement officer employed by the City of Portsmouth. Upon information and belief, Sergeant Connor was one of the officers directly responsible for the shooting of Anthony J. Previte on July 22, 2024.

20.    Defendant, Sergeant Craig Forrest ("Sergeant Forrest") is and was at all relevant times to this action a law enforcement officer employed by the Town of Durham. Upon information and belief, Sergeant Forrest was one of the officers directly responsible for the shooting of Anthony J. Previte on July 22, 2024.

21.    Defendant, Officer Nicholas Glowacki ("Officer Glowacki") is and was at all relevant times to this action a law enforcement officer employed by the Town of Seabrook. Upon information and belief, Officer Glowacki was one of the officers directly responsible for the shooting of Anthony J. Previte on July 22, 2024.

22.    Defendant, Sergeant Theodore Sierad ("Sergeant Sierad") is and was at all relevant times to this action a law enforcement officer employed by the Town of Exeter. Upon information and belief, Sergeant Sierad was one of the officers directly responsible for the shooting of Anthony J. Previte on July 22, 2024.

23.    Defendant, Sergeant Robert Kenyon  ("Sergeant Kenyon") is and was at all relevant times to this action a law enforcement officer employed by the Town of Hampton. Upon information and belief, Sergeant Kenyon was one of the officers directly responsible for the shooting of Anthony J. Previte on July 22, 2024.

24.    Defendant, Corporal Jay Pappalardo ("Corporal Pappalardo") is and was at all relevant times to this action a law enforcement officer employed by the Town of Hampton. Upon information and belief, Corporal Pappalardo was one of the officers directly responsible for the shooting of Anthony J. Previte on July 22, 2024.

## Venue & Jurisdiction

26.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

27.    Defendants are subject to personal jurisdiction in this district because they each reside and have principal places of business here.

28.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because the Defendants reside here and a substantial part of the events or omissions giving rise to this claim occurred in this district.

## Nature of the Claims

29.    This case arises from the police shooting of Anthony Previte on July 22, 2024.

30.    Anthony was the 29-year-old son of Kim and Andrew ("Andy") Previte Jr. (collectively, "the Prevites").

31.    Anthony's death resulted from the Defendants' recklessness, unreasonable conduct, unwarranted and unhelpful escalation, and use of military-style siege tactics and equipment to address a solitary individual in the midst of a mental health crisis who was alone within his own home.

32.    After enduring hours of aggressive and threatening police communications, actions, and conduct, and after being shot and wounded by a sniper rifle through an upstairs window, and after tri chamber CS tear gas was deployed outside of the room he was occupying,

7

Anthony ran out of the home, away from officers at the front door, who shot him dead on his front lawn.

33.    The Defendants' handling of the situation, from the time police arrived on scene through the excessive force used to kill Anthony, constitutes violations of Anthony's constitutional rights under the Fourth and Fourteenth Amendments, wrongful death, and gross negligence.

**Events Prior to July 22, 2024**

34.    Anthony lived with his parents, Kim and Andy.

35.    He was a happy, healthy child, teenager, and young adult.

36.    During the COVID-19 pandemic, Anthony began to experience a change in the way he thought and developed recurrent mental health issues.

37.    In June of 2023, Anthony was assaulted in Portsmouth, New Hampshire. The police officers that responded did not believe Anthony and instead arrested him. This experience exacerbated his mental health problems and tied them to a distrust of the police. Prior to this incident, Anthony had absolutely no interest in guns or weapons, but following June of 2023 Anthony felt compelled to obtain a gun for self-defense purposes.

38.    On December 28, 2023, and continuing until December 30, 2023, the Prevites observed that Anthony was acting very paranoid and appeared to be hallucinating.

39.    He then attempted to jump out of a window of their house. The Prevites called the Kensington Police Department and petitioned for an Involuntary Emergency Admission ("IEA") of Anthony.

40.    Anthony was first taken to the Exeter Hospital Emergency Department by the Kensington PD, where he was medically cleared for psychiatric evaluation.

41.    Anthony was then involuntarily admitted to Parkland Medical Center in Derry, New Hampshire and was released on January 12, 2024.

42.    Kensington PD was aware of this history of mental health issues as well as Anthony's prior hospitalization.

43.    SERT and other responding officers were also made aware of Anthony's history of mental health issues on July 22, 2024.

**July 21-22, 2024**

44.    On the evening of July 21, 2024, Anthony, Andy, and Kim were all at the Previte Residence. Andy and Kim went to bed at around 10:00 PM, and Anthony was in the basement.

45.    At approximately 11:35 PM, Kim received a text message from Anthony regarding a homemade cookbook with recipes his grandmother and other family members had collected. Anthony, in a delusionary state, thought the normal recipes in the book somehow suggested that the family was involved in cannibalism. Kim encouraged Anthony to get some sleep and told him they would discuss his concerns in the morning.

46.    Anthony told Kim that he was going to call the police.

47.    Kim encouraged him not to call them in the middle of the night. She eventually went downstairs to the basement, where Anthony was sitting on the couch and asked him again to get some sleep.

48.    Anthony hugged Kim, and they both went to their bedrooms.

49.    Unbeknownst to Kim, at approximately 12:15 AM on July 22, 2024, Anthony called the police and told them that he had found "suspicious items" owned by his grandmother that he believed could be linked to missing persons.

50.    The New Hampshire State Police Incident Report notes that the 12:18 AM call was from an "Emotionally Disturbed Person."

51.    The police dispatcher discussed the matter with the New Hampshire State Police, who declined to respond to the Previte Residence that evening, seeing no immediate concern or threat that would require action.

52.    Instead, the dispatcher sent a call for service the next day to the fax machine at the Kensington Police Department.

53.    The Kensington Police Department sent an officer to conduct a wellness check on Anthony at approximately 12:05 PM on July 22, 2024.

54.    That morning, Kim told Andy what had happened with Anthony the prior evening, and they decided to try to sit down with him later that day to discuss his concerns, but also to encourage Anthony to seek mental health care.

55.    The Prevites were concerned that his pattern of behavior was similar to what had led to his prior IEA in December 2023.

56.    Shortly after Anthony woke up, at approximately 7:30 AM, he began talking about an apocalypse that would occur in two days and was speaking and acting erratically.

57.    Kim was refusing to engage, and to obtain a response from her, Anthony placed an open hand on her shoulder and lightly pushed her to get her attention and to block her exit.

58.    Anthony did not hit, slap, punch, or harm her in any way.

59.    Kim was worried about the statements Anthony was making, because he sounded desperate, worried, and delusional. Kim did not feel threatened by Anthony, and never saw him with a gun that morning, but she was worried about his mental health. Kim's worries were

10

mostly about Anthony's state of mind because Anthony was desperately trying to convince Kim that the end of the world was coming. She was not worried about her own safety or well-being.

60.     Kim decided to calmly leave the Previte Residence, walking out the back door of the home off the kitchen, and called Andy, who had already left for work.

61.     Andy returned and picked Kim up in his car, and they discussed the best course of action for handling their mentally ill son.

62.     At approximately 12:05 PM, before Andy and Kim were able to take any steps to address Anthony's mental health crisis, Officer James Collier ("Officer Collier") responded to the Previte Residence, following up on Anthony's call to the police the previous evening.

63.     At around the same time, Kim and Andy returned to the Previte Residence and spoke with Officer Collier about what had happened that morning.

64.     Kim and Andy informed Officer Collier of Anthony's mental health struggles and the concerning statements he was making. In the hopes of limiting surprise and unnecessary escalation, the Prevites also told Officer Collier that Anthony legally owned a handgun, that Kim had Anthony's cell phone, and that the only way to contact Anthony at that time was through his iPad.

65.     Officer Collier then notified Rockingham County Dispatch that the situation was no longer a follow up, but a "past tense Domestic situation."

66.     Officer Collier looked up Anthony's call history, and observed calls for service for mental health struggles, as well as IEAs.

67.     Officer Collier requested two additional officers to respond.

68.     Officer Collier also requested rescue units to stage themselves at the beginning of Olivia Lane.

69.    Additional officers quickly arrived at the Previte Residence.

70.    Officers attempted to contact Anthony via his iPad but could not reach him.

71.    Kensington Police Officers set up a perimeter around the Previte Residence, armed with rifles, completely surrounding the home.

72.    After attempts to contact Anthony through his iPad were unsuccessful, officers paged Kensington Police Chief Cain and notified him of the situation.

73.    Chief Cain requested a "signal 1000" to Rockingham County Dispatch, which indicates an emergency in progress.

74.    At some point during the call-out attempts to Anthony, Chief Cain arrived at the Previte Residence.

75.    At around the same time, Kim & Andy, seated in Andy's car, spoke with Kensington PD Detective Michael Munck, who was standing on the driver's side of Andy's car.

76.    During that conversation, which took place shortly after police arrived on the scene, Kim and Detective Munck heard Chief Cain say over his radio that Anthony had threatened Kim with a gun, which was untrue.

77.    Detective Munck immediately walked over to Chief Cain, who was standing in the street near his vehicle, and informed him that Anthony had not threatened Kim with a gun.

78.    However, soon after that, Andy overheard Chief Cain state  "this is not going to end well."

79.    Officer Meidico of the Kensington PD then attempted to speak to Anthony through the loudspeaker on one of the nearby police vehicles. He told Anthony the people outside the house were police officers and demanded that Anthony come out of the house with his hands up. Anthony did not respond.

80.     At approximately 2:00 PM, Kensington PD requested SERT's assistance.

81.     That request elicited officers from various police departments in the Seacoast area who were trained to handle critical incidents and crisis situations.

82.     At this point, nothing had changed, and Anthony remained in the home by himself and had not exhibited any behavior indicating he presented a threat to anyone else.

83.     The officers that arrived as part of the SERT response or had otherwise responded to the Previte Residence were told, and knew, about Anthony's mental health condition and his recent struggles.

84.     SERT soon set up a command post at the Previte Residence to brief responding officers on Anthony's situation within the house and to make tactical, military-style engagement decisions.

85.     SERT first took over the perimeter that Kensington PD officers had created, ringing the Previte Residence with officers equipped with protective body armor and AR-15 rifles.

86.     Team leaders of the SERT response tasked some officers with using lethal ammunition and assigned others to use less lethal ammunition.

87.     SERT then brought to the scene its "BearCat," an armored vehicle equipped with gun ports and communication systems, which is typically used for tactical, high-risk missions.

88.     The original purpose of the BearCat was to block the driveway of the Previte Residence so that if Anthony attempted to flee, he would not be able to get away in a vehicle.

89.     The BearCat was loaded with a 40-millimeter multi launcher, which can shoot both lethal and less lethal munitions.

90.     SERT loaded a 40mm sponge round into the multi launcher that was meant to target a suspect's torso or extremities.

91.     SERT officers discussed that the sponge rounds were to be used if Anthony exited the Previte Residence but was non-compliant.

92.     The SERT BearCat was also equipped with guns and other lethal options.

93.     At the same time, police continued to try to communicate with Anthony through his tablet, but he did not respond.

94.     At approximately 5:30 PM, Detective Munck informed SERT that he had received a signed warrant for Anthony's arrest for simple assault and criminal threatening, as well as a search warrant for the search of the Previte Residence for Anthony.

95.     Officers then attempted to speak to Anthony through the loudspeaker on the BearCat. These announcements threatened: "This is the police. We need to talk to you. We have a warrant for your arrest. Come out unarmed with your hands up."

96.     SERT also claimed to have gained access to the Prevites' Amazon Alexa System, and, although the Alexa logs do not reflect this fact, officers reported that they were able to speak through the device and hear what was happening inside the home. Police said they could hear Anthony listening to music.

97.     At some later point in the afternoon, the Portsmouth PD drone team arrived at the Previte Residence and began flying drones around the house in an attempt to see where Anthony – the paranoid young man in the midst of a mental health crisis – was located.

98.     The drones located Anthony in the second-floor bathroom at the backside of the house, which is against a large backyard and a dense wooded area, where it is difficult to see

neighboring homes, and is approximately one tenth of a mile through thick trees to Route 107 in the rear.

99.     At approximately 7:58 PM, the Strafford County Regional Tactical Operations Unit ("SCRTOU") arrived with an additional BearCat equipped with a wide range of impact munitions, chemical munitions, and handheld deployable devices. SCRTOU also brought a robot.

100.     The SCRTOU BearCat drove up onto the front lawn directly in front of the front door, and the SERT BearCat moved up further into the driveway in order to cover the entire backyard with both lethal and less lethal munitions.

101.     Officers prepared the SCRTOU BearCat to use a vehicle-mounted battering ram to break down the front door, and officers were separated into the two BearCats with K9s.

102.     As of this time, Anthony had not pointed or fired a weapon and did not have any hostage or other person with him or close enough to harm them.

103.     Regardless, police sent the SCRTOU robot into the Previte Residence. First, it delivered a cell phone to Anthony.

104.     The robot went into the Previte Residence, placed the cell phone on the ground outside of the bathroom, and then rammed into the bathroom door to get Anthony's attention.

105.     After the robot rammed the bathroom door, Anthony pointed a gun at the door from inside. The robot pushed the phone underneath the door.

106.     Police outside made announcements on the loud hail system, telling him to answer the phone.

107.     Anthony then attempted to block the gap underneath the door with a towel, pushing the phone back out. The robot pushed the phone back in.

15

108.    Crisis negotiators attempted to call the cell phone, but Anthony did not pick up.

109.    Officers then flew their drones near the window of the bathroom in an attempt to get Anthony to answer the cell phone.

110.    Anthony was reportedly heard saying that, if a particular drone did not leave, he was going to shoot it.

111.    Despite Anthony's statements, the drone did not leave the area, and Anthony shot the drone.

112.    Detective Kenyon reported on the radio to other officers that Anthony had fired one shot at the drone and had not aimed his weapon directly at any people.

113.    At approximately 9:40 PM, SERT used the Amazon Alexa inside the Previte Residence to turn off all of the lights, and staged blinding spotlights in front of the home.

114.    At approximately 10:35 PM, SERT sent the SCRTOU robot back into the Previte Residence to deploy tri chamber CS gas – a type of tear gas – in the hallway outside of the bathroom.

115.    CS gas is typically used as a riot control agent. It can cause temporary blindness, severe pain, coughing, shortness of breath, and skin burns.

116.    The cloud of noxious smoke that the robot released was so thick that it obscured the bathroom door completely from the camera.

117.    Anthony attempted to open and close the bathroom window to clear the area of the gas. Officers saw him leaning out of the window at points. He had a gun, but it was not aimed at anyone.

118.    At this point, he was alone in his home, in the throes of a mental health crisis, and encountering a cloud of unknown gas released by a robot, drones flying outside his window, and

military-style vehicles driving on his front lawn, all while unable to see outside because of blinding spotlights.

119.    Shortly thereafter, at approximately 10:36 PM, Sergeant Kenyon shot Anthony through the bathroom window. Anthony disappeared from view. Although the police reports only mention a single shot, when Andy and Kim returned to the Previte Residence the following day, they observed numerous bullet holes in the walls of the bathroom Anthony was in.

120.    Sergeant Kenyon announced over the radio that he had shot Anthony.

121.    Captain Small, who had been operating the robot, observed that Anthony had been shot and was repeatedly flailing on the floor of the bathroom, and that he appeared to be wounded. Captain Small believed that Anthony had been shot somewhere in the torso.

122.    Shortly thereafter, Anthony got up from the bathroom floor, ran away from the drone flying outside his window, past the police-controlled robot that had gassed him, and down the stairs towards the front door.

123.    As he ran, Anthony had the same pistol he had used to fire one shot at a drone in a modified casing slung around his shoulder. He did not have the gun in his hands.

124.    At this point, the Previte Residence was, and had been for hours, entirely surrounded by armored officers, drones, K9 units, and two BearCat vehicles.

125.    Anthony exited the front door, still without a gun in his hands and began immediately running ***away*** from the officers outside the front door.

126.    As he began running away, and despite being unarmed, officers opened fire discharging approximately 15-20 lethal shots at Anthony. He was struck 7 times in his head, chest, abdomen, hip, shoulder, and knee killing him instantly 10 feet from the front door.

127.   The officers on scene had multiple less lethal means available to subdue Anthony, including non-lethal bullets and projectiles, tasers, K9 units, and other devices. However, Defendants Sergeant Kenyon, Sergeant Connor, Sergeant Forest, Officer Glowacki, and Sergeant Sierad improperly and inexcusably escalated the situation and used deadly force against Anthony. Officer Pappalardo used less lethal munitions, as all of the responding officers could have used.

128.   Captain Small, at the request of SERT Command, then deployed a flash bang at Anthony's body in order to check if he was still alive, hitting him in the head, instead of immediately providing medical care.

129.   Tragically, Anthony was a mentally ill young man in crisis and within his own home, with no one else home or in danger. He was afraid and confused. But, instead of approaching the situation in a manner designed to account for his mental health condition and resolve the situation without violence, the Defendants continually and consistently escalated their military-style siege of the Previte Residence, until Anthony fled the apocalyptic chaos the police had created in and around his home and was shot dead on his parents' front lawn.

130.   The Prevites seek to recover for the Defendants' reckless and unconstitutional conduct, without which their son would still be alive today.

131.   The Prevites, through counsel, sent Notice of Claim letters to each of the municipal defendants on July 14, 2025. No defendant responded to the Prevites' Notice of Claim or a subsequent demand letter from the Prevites' counsel.

<u>COUNT I</u>
**42 U.S.C. § 1983 – Violation of the Fourth Amendment**
**AGAINST CHIEF CAIN, OFFICER COLLIER, DETECTIVE MUNCK, DEPUTY**
**CHIEF MCCAIN, LIEUTENANT TONDREAULT, DETECTIVE BUCZEK, CHIEF**
**RENO, CAPTAIN SMALL, SERGEANT KEYSER, SERGEANT SICHKO, OFFICER**
**CONNOR, OFFICER FOREST, OFFICER GLOWACKI, OFFICER SIERAD,**
**DETECTIVE KENYON AND CORPORAL PAPPALARDO (THE "POLICE**
**DEFENDANTS")**

132.    Plaintiff incorporates the preceding paragraphs herein.

133.    Anthony Previte was protected from unreasonable search and seizure of his person by and pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and was entitled to be safe and secure from undue and unreasonable excessive force.

134.    The Police Defendants, in their individual capacities, acting under the color of state law, unjustifiably and unreasonably failed to de-escalate the confrontation at the Previte Residence and in fact unjustifiably and unreasonably escalated the situation, leading to the shooting and killing of Anthony Previte under circumstances which no reasonable law enforcement officer would have created.

135.    The Police Defendants, in their individual capacities, acting under the color of state law, also unjustifiably and unreasonably escalated the intensity and danger of the situation at the Previte Residence, leading them to directly shoot and kill Anthony Previte under circumstances where no reasonable law enforcement officer would have done so.

136.    The Police Defendants' unreasonable and unlawful conduct included failing to de-escalate the confrontation at the Previte Residence from the time police arrived on the scene through the time Anthony was shot and, in fact, repeatedly escalating the intensity, danger, and deadliness of the situation by their use of progressively aggressive and threatening military-style tactics.

137.    It also included failing to adequately consider and compensate for the fact that Anthony was in the throes of mental illness and paranoia, which they knew, and instead engaging in conduct – including the use of drones, robots, and military-style vehicles – that only exacerbated Anthony's mental anguish and was entirely unnecessary under the circumstances.

138.    The acts and omissions of the Police Defendants constitute an extreme and excessive seizure unjustified by cause, were objectively unreasonable based on the totality of the circumstances, and violated Anthony's constitutional rights.

139.    Moreover, the Police Defendants themselves, under the totality of the circumstances, created the perceived danger they may allege as justification for their killing of Anthony, and thus put themselves in officer-induced jeopardy (to the extent any such jeopardy existed) and were responsible for his death.

140.    As administrator of the Estate, Kim has legal standing to assert claims against those responsible for Anthony's death.

141.    The Estate has suffered damages as a result of the Police Defendants' unlawful actions in an amount to be determined at trial.

142.    The Estate is also entitled to recover its reasonable attorneys' fees incurred in connection with this case pursuant to 42 U.S.C. § 1988.

**COUNT II**
**42 U.S.C. § 1983 – Violation of the Fourth Amendment under *Monell v. Dep't of Soc. Servs.***
**AGAINST KENSINGTON, PORTSMOUTH, HAMPTON, GREENLAND, EXETER,**
**SEABROOK, AND DURHAM (THE "MUNICIPAL DEFENDANTS")**

143.    Plaintiff incorporates the preceding paragraphs herein.

144.    The Municipal Defendants unjustifiably created official policies and widespread practices, and failed to train or supervise their respective law enforcement officers amounting to

deliberate indifference that led to the extreme escalation of the situation at the Previte Residence on July 22, 2024, culminating in officers shooting and killing Anthony.

145.    The Police Defendants' actions were endorsed and approved by the Municipal Defendants. As a direct result of the policies, practices, customs, and procedures the Municipal Defendants employed and taught in responding to a perceived emergency, Anthony Previte was deprived of his constitutional right to be free from unreasonable searches and seizures guaranteed to him by the Fourth and Fourteenth Amendments to the United States Constitution.

146.    These policies, practices, customs, and procedures were maintained with deliberate indifference to the predictable consequences that the Police Defendants (and other officers) would violate the constitutional rights of persons, including those of Anthony J. Previte.

147.    The policies and procedures endorsed by the Municipal Defendants, which include the escalation tactics that led deadly force to be used under the circumstances herein violate the Fourth and Fourteenth Amendment protections held by Anthony J. Previte.

148.    The escalation of the events on July 22, 2024, and the Police Defendants' use of objectively unreasonable and excessive force as set out above was in accordance with the Municipal Defendants' policies, procedures, practices, and customs, including but not limited to those relating to responding to individuals in circumstances like Anthony J. Previte, handling situations involving serious mental health crises, and the use of force.

149.    The individual agents and officers acted in accordance with the Municipal Defendants' policies, procedures, customs, and practices and acted under color of law.

150.    The Municipal Defendants' deficient policies, procedures, customs, and practices were a direct and proximate cause of the use of excessive force and Anthony J. Previte's death. As a direct result of these policies, procedures, customs, and practices, Anthony was deprived of

his constitutional right to be free from unreasonable searches and seizures guaranteed to him by the Fourth and Fourteenth Amendments.

151.    As administrator of the Estate, Kim has legal standing to assert claims against those responsible for Anthony's death.

152.    The Estate has suffered damages as a result of the Defendants' unlawful actions in an amount to be determined at trial.

153.    The Estate is also entitled to recover its reasonable attorneys' fees incurred in connection with this case pursuant to 42 U.S.C. § 1988.

**COUNT III**
**RSA 556:12 – Wrongful Death**
**AGAINST THE POLICE DEFENDANTS**

154.    Plaintiff incorporates the preceding paragraphs herein.

155.    The Police Defendants, as responding officers, had a duty of care to Anthony to act as a reasonable police officer would under the circumstances in their response to the Previte Residence, their escalation of the situation, and their eventual shooting of Anthony.

156.    The Police Defendants breached their respective duties of care owed to Anthony.

157.    The Police Defendants' breaches included, but are not limited to, failing to appropriately account for, and respond to, Anthony's acute mental health crisis, of which they were aware; unnecessarily and grossly escalating the confrontation with Anthony despite the fact that Anthony did not pose a threat to anyone, through the use of military-style tactics and vehicles, robots, drones, and an overwhelming amount of deadly force; and using deadly force as Anthony ran away from officers outside the front door.

158.    The Police Defendants acted in a reckless and wanton manner, consciously disregarding a substantial risk of death to Anthony. Their conduct exceeded any legitimate

discretionary function, thereby removing them from the protection of official immunity under New Hampshire law. Accordingly, RSA 556:12 wrongful-death liability attaches.

159.    The Police Defendants' actions were the proximate and legal cause of Anthony's death.

160.    As administrator of the Estate, Kim has legal standing to assert claims against those responsible for Anthony's death.

161.    The Estate has suffered damages as a result of the Defendants' breaches in an amount to be determined at trial.

### COUNT IV
### Negligence
### AGAINST THE POLICE DEFENDANTS

162.    Plaintiff incorporates the preceding paragraphs herein.

163.    The Police Defendants, as responding officers, had a duty of care to Anthony to act as a reasonable police officer would under the circumstances in their response to the Previte Residence, their escalation of the situation, and their eventual shooting of Anthony.

164.    The Police Defendants breached their respective duties of care owed to Anthony and their conduct constitutes gross negligence.

165.    The Police Defendants' negligence included, but is not limited to, failing to appropriately account for, and respond to, Anthony's acute mental health crisis, of which they were aware; unnecessarily and grossly escalating the confrontation with Anthony despite the fact that Anthony did not pose a threat to anyone, through the use of military-style tactics and vehicles, robots, drones, and an overwhelming amount of deadly force; and using deadly force as Anthony ran away from officers outside the front door.

166.    The Police Defendants acted in a reckless and wanton manner, consciously disregarding a substantial risk of death to Anthony. Their conduct exceeded any legitimate discretionary function, thereby removing them from the protection of official immunity under New Hampshire law

167.    The Police Defendants' negligence was the proximate and legal cause of Anthony's death.

168.    As administrator of the Estate, Kim has legal standing to assert claims against those responsible for Anthony's death.

169.    The Estate has suffered damages as a result of the Defendants' gross negligence in an amount to be determined at trial.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

a.   Enter Judgment in her favor on each Count of this Complaint;

b.   Award her damages in an amount to be determined at trial, as well as pre and post judgment interest;

c.   Award her her reasonable attorneys' fees incurred in connection with this case pursuant to 42 U.S.C. § 1988; and

d.   Enter such further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted,

KIM E. PREVITE, as Administrator of the
ESTATE OF ANTHONY J. PREVITE

By its attorneys,

SHEEHAN PHINNEY BASS & GREEN PA

*/s/ Aaron D. Rosenberg*

Aaron D. Rosenberg (NH Bar #274409)
Damon M. Seligson (motion for *pro hac vice*
admission to be filed)
Jennifer S. Tamkin (NH Bar #279794)
1000 Elm Street, 17th Floor
P.O. Box 3701
Manchester, NH 03105-3701
(603) 627-8239
arosenberg@sheehan.com
dseligson@sheehan.com
Date: December 9, 2025          jtamkin@sheehan.com